In our briefing, we spent a lot of time talking about the Sayal v. Ashcroft case, and we also cited the LeLong case, and both of those cases, of course, involved the asylum claims of ethnic Chinese. The LeLong case? LeLong. I think that's been withdrawn. I believe that it's, I think there's a petition pending. Exactly. The case is still good law at this point. I don't think it's been withdrawn, as far as I'm aware. Well, I'm not sure. I thought it was, but I may be wrong. I think, and Ms. Smith, I think probably will have a clear answer, but from looking at PACER, I didn't think it had been withdrawn. But we, I guess my point is first that even, we don't think that the Court even needs to reach the same analysis that the panels in Sayal and LeLong undertook in analyzing this case. And the reason for that is because while the petitioners in those cases didn't allege that they were persecuted in the past, we believe that the record in this case compels the conclusion that Mr. Hikoe was persecuted. This Court has almost uniformly held that where an asylum applicant is the victim of a violent attack on account of a protected ground, that that rises to the level of past persecution. And in this case, there's a single incident that Mr. Hikoe described that rises to the level of past persecution. He said, he testified that in 1991, he was in his coffee shop when ethnic Indonesian demonstrators began demonstrating, yelling such things as Chinese are atheists, telling Chinese to leave Indonesia. And in the course of that demonstration, they burned his coffee shop. He ran out of his coffee shop. And as he was running out of his coffee shop, he was beaten in the back with sticks by people who were yelling, kill Chinese. And as a result of that beating, he suffered a fractured shoulder.  And he testified that even to this day, he still experiences pain in his shoulder. So we believe that under the law of this circuit, that evidence in and of itself compels a finding that Mr. Hikoe suffered past persecution. Our case, HOXA, H-O-X-H-A. Yes. And of course, SAEL, S-A-E-L, seemed to control in this area. Do you agree on that? Well, if the court doesn't find that there's past persecution, then certainly... Well, tell me about HOXA. And these are all fact-specific. All these cases are driven by fact-specific. What makes your case different than the HOXA case relative to... I mean, it's apples and oranges because they're not exactly the same facts. But why is your case so persuasive relative to past persecution? Now, SAEL did not reach past persecution, but HOXA did. Right. And I think HOXA, I mean, it ended up... My reading of that is that it ended up being an analysis of a future persecution as opposed to... Well, but they found that he did not present sufficient evidence to show past persecution. Now, who did the persecution in this case? Why is it persecution under our law? I'm not talking about a well-founded fear of future persecution. I'm talking about the past persecution. Sure. The past persecution... I mean, the people who targeted Mr. Eco were, in every case, not government actors. They were non-government actors, but... And that kind of fits directly into the fear, the well-founded fear of future persecution. It certainly goes to both. I mean, it certainly... We believe it establishes past persecution, but it also... Well, I don't mean to interrupt you. I want to kind of focus you because this is where I'm really hung up. It seems to me that if you look at Haksa and Leng Aung Sao, we've established in this area the situation with regard to Indonesia and Christian Chinese. And the history is legion. I mean, it goes back for a long time. So now we've established what's all about this group. But what we haven't seemed to establish that I can... And that goes to the issue of well-founded fear of persecution because that sets a base for the future persecution. What I'm having a hard time with, and you just put your finger on it, is that it's not the governments out there burning houses. We don't have the death squads like we did in Nicaragua and San Salvador, the government shooting people. So how do we analyze the factual situation which drive these relative to past persecution? I think the analysis begins with a question of who the actors are and what their motivation is. So the actors are non-government actors in every case in this case. And so the next question is what their motivation is. In each case of Mr. Higo, in each incident Mr. Higo described, the persecutors, they referred to his ethnicity or to his religion in some kind of derogatory manner. So then the next question is, is the government of Indonesia unable or unwilling to stop that violence? And that's a key to me, too. Tell me specifically in your record that would be the substantial evidence that supports that the government, in this case in any case, was part of this that condoned whatever. Well, the first thing I want to say about that, Your Honor, is that we don't believe that that's even before the court, because I don't think, under Chenery, I don't think the board even relied on the unable or unwilling prong of it. I mean, they just said it. They didn't. They didn't. They said there wasn't enough harm. There wasn't enough harm. Right. The level of past persecution. Right. So I don't think, since they didn't specifically address that, I don't think it's even before the court. But you brought it up, though. That's why I was wondering whether that's part of your case. If they didn't bring it up, then we shouldn't consider it. Right. The unable or unwilling. Yeah. I mean, I don't think it's an issue. I mean, I think it's certainly part of the analysis, but I don't think it's – Well, we can't – if it wasn't brought up, it's not – So I'm still back to what is your analysis on the factual basis for the past persecution? Well, my analysis is the same. It's just that that particular part of it isn't – I mean, the issue that the board had a problem with was whether it actually rose to the level of past persecution. And, you know, we believe that, as I said, that single incident in and of itself rises to the level. But even if you don't believe that that's the case, we believe that the cumulative harm does. And the cumulative harm includes, as a child, he was beaten and harassed because of his ethnicity and religion. He had rocks thrown at him over his lifetime when he went to church. He experienced discrimination in seeking an education, in seeking a job, in seeking a permit for his business. In the period before that 1991 attack, for a three-year period, nearly monthly demonstrators were outside his shop, threatening him, throwing rocks at him. And even after he left, after 1991, when he left Jakarta, he continued to suffer threats and harassment at the hands of ethnic Indonesians. So we think that, cumulatively, all of that rises to the level of past persecution. And we cited the Korablina case in our briefing. And in that case, the petitioner was fired from her job, threatened with death. Some people who were close to her were physically harmed, and she was physically harmed on one occasion. Let me ask you, if we disagree with you, and find that even though sympathetic, that the actual nature of these facts don't compel a finding of past persecution, where does that leave you? Then you would go to the well-founded fear analysis that the Court did in Sahel. And the question I have on that is whether the Board used the wrong standard of review. We believe that the Board did. And that's what we argued, that kind of our last alternative argument was that they applied the more likely-than-not standard instead of the 1 in 10 standard for asylum. So they only applied the withholding standard in making the determination. So we believe that if the Court doesn't find that there is past persecution, or that the record compels a finding of past persecution, and if the Court doesn't find that it's more likely, that he's established that it's more likely than not that you'd be harmed if you were returned to Indonesia, that the proper avenue in that case, under the Reyes-Reyes case, would be to remand to the Board and give them instructions to analyze the well-founded fear asylum eligibility under the correct standard. That's enough. If that's the decision we make, that's enough to get your remand. That's true. The wrong legal standard in and of itself. Yes. I'll save the last few seconds for about that. All right. Before you start on past persecution, of which there's much to discuss, I just wanted to ask you about the standard of review with the more likely than not. Actually, before I reach there, if I may, the government's actually requesting that the Court hold this case in abeyance,  And I think it's important to note And that's something that we obviously consider when we look at Lelong and the pending petition in that case. So that's obviously something that we would consider. Because of the issue of the disfavored group, we feel it could have applicability. Correct. Alternatively, if the Court does not want to hold it in abeyance, then we would seek to remand, primarily because the Board did not yet have the solid decision before it when it ruled, and we do believe the solid decision would have applicability and the Board should consider it in the first instance. And considering that, it would affect on all the issues, in addition to determining whether or not they should look at the credibility issue. Because they didn't rule on credibility in the first instance, even though the I.J. had issued both a credibility finding and an alternative finding, because they found the alternative finding was sufficient. So just to make sure I'm clear, let's say that the Lelong doesn't change anything, and that decision stays as is, then your position is that we should not really address the past persecution or the other issues, but remand it so that the Board can consider it in light of sale? Correct, Your Honor. All right. Well, I got that. Now let me go back to Judge McKeon's first question. If the BIA made a legal error in the standard, more likely than not, what has Lelong have to do with that and why shouldn't we just remand on that if they did make an error? I think it's the issue of whether they did or didn't I think is questionable. And if they did make an incorrect, if they used the incorrect legal standard, it's clear that your Board should remand. Well, let's assume they did make an incorrect standard. Let's assume that. Now, what does that have to do with Lelong or anything else? Isn't that an error enough for remanding this case? Well, we still think our first position is that things should be held in abeyance because of Lelong because we're not sure what's going to happen. With respect to the standard, if you believe the incorrect standard was used, then it would need to be remanded. We do think it's arguable within the decision that they did use the correct standard. They talk about asylum at one point. They talk about withholding. I would agree it's not clear, but I do think it's arguable if they used it. Okay. Well, let's go to page 2 of their decision. And they actually put into quotations more likely than not. Yes, Your Honor. In the full second paragraph, also on page 2, they indicate, we agree with the immigration judge's conclusion that the Respondent failed to meet his burden of establishing past persecution or a well-founded fear of persecution on account of one of the statutorily protected grounds, or that he is more likely than not to be persecuted or tortured if he must return to Indonesia. So they seem to be citing the correct standards in that paragraph. Excuse me. I didn't quite understand. I'm still having a hard time hearing it. It must be my ears are going. Which paragraph are you talking about? In the second full paragraph, Your Honor. Okay. They separately talk about more likely than not, presumably with respect to withholding and the torture convention claims, as opposed to the asylum claims. The next paragraph appears to relate to asylum. And then the final paragraph appears primarily to relate to withholding, though they also do mention well-founded fear of persecution there. So I don't think it's clear, but I do think it's arguable that they did use the correct standard there. I mean, it's just, I'm having a little trouble understanding why saying it's more likely than not that he would be persecuted if he must return, that seemed to me as I read it to basically be a future persecution statement. I can't read it any other way, but... In terms of paragraph 4? Yes. Your Honor. 1, 2, 3, 4. All right. I understand what you're saying and I do think that it's arguable that paragraph 3 seems to talk about asylum and I would think that would apply to both past persecution and well-founded fear. Let's just say you're correct and we can't figure out what standard the Board used. Wouldn't that leave us in the same position? I mean, I think it's... So in that case, let me just ask sometimes, why does the government argue so hard in these cases? You know, if everything's arguable about what they did, clearly they used one standard that's wrong if applied to asylum and then if we can't tell because they mix and match, why wouldn't the government simply agree that it could go back because obviously they will apply the correct standard presumably on remand because they'll have more attention to how we would be able to look at it on review. Why wouldn't the government just simply say they would agree to a remand in a case like that? I don't know if this was previously addressed in this case or not, Your Honor. I mean, I don't believe in reading the government's responsive brief that we specifically dealt with this issue. But in terms of just generally reading it, I don't think it's definitive that the Board used the wrong standard. I mean, he appeared to know in Paragraph 2 what he was doing because he appeared to merge the two together in Paragraph 4. I don't think that that would be sufficient to show that he used an incorrect standard. In Paragraph 3, when they're talking about asylum, the Board says there is nothing to demonstrate that the respondent has faced persecution or is likely to experience such persecution. There, the suggestion is that they're not applying the more likely-than-not standard. I must be wrong. Which Paragraph 3 are you talking about? On Page 2? On Page 2, Paragraph 3, Your Honor. I was starting from the first of it. So it's Paragraph 3 on Page 2. Correct, Your Honor. Let me ask another question just to make sure I understand your position. When you started, you said there should be a remand so that the Board could take a look at credibility. That's one of the things they would do? Well, our initial position was hold it in abeyance. Certainly, we're wrong. Secondly, remand, but we were indicating a remand consideration would be of the Saul decision, but also consideration should be of the adverse credibility to give the Board the chance to make a specific adverse credibility finding because in their decision, they didn't reach that issue. The IJ had reached both. But if you're going to look at the case in terms of sale, it may be necessary as well to look at the credibility of your client. I understand. Thank you. Thank you. Just one brief point. Although we certainly don't oppose a remand for either the application of the correct standard or for the Board to consider the Sael decision, we would still ask the Court to consider the past persecution issue because we believe that since the record compels that conclusion, the Court can consider those other two issues. Thank you. Thank you. The Court thanks both counsel for their argument in both cases this morning.
judges: Brunetti, McKeown, King